# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| JOHN WEAVER and JAMIE WEAVER, individually and as parents and natural guardians of JW and BS, *minors*, | ) ) ) ) |
|---|---|
| Plaintiffs, | ) 2:12-cv-1777 ) ) |
| vs. | ) ) ) |
| ANGELA MARLING, *as an individual*, | ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before a Court is the MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) (ECF No. 10) filed by Defendant Angela Marling with brief in support (ECF No. 11). Plaintiffs John and Jamie Weaver filed a brief in opposition (ECF No. 15). Accordingly, the motion is ripe for disposition.

### I. Background

As the law requires, all disputed facts and inferences must be taken as true and resolved in favor of Plaintiff, the non-moving party. The following background is drawn from the Amended Complaint, and the factual allegations therein are accepted as true for the purpose of this Opinion.

The events leading up to the Amended Complaint began on or about June 26, 2012 when JW, a seven-year-old female minor, allegedly suffered an injury to her genital area as a result of a fall while using an exercise bike at the residence of Plaintiffs John and Jamie Weaver.[1] Plaintiff John Weaver is the adoptive father of JW and shares custody of her with his ex-wife and

---

1. At all relevant times, Mr. and Mrs. Weaver have served as foster parents approved by Fayette County.

JW's adoptive mother, Jennifer Kelly. Plaintiff Jamie Weaver, wife of John Weaver, is the natural mother of BS, a seven-year-old minor female, who shares custody of that child with BS's biological father, Kirk Marilungo. After JW reportedly fell and sustained an injury, she did not initially inform anyone, including the Weavers.

Later that evening, JW returned to Ms. Kelly's care and reported the injury to her mother. The Amended Complaint is notably silent regarding what precisely JW told her mother regarding the cause of her injury. Nonetheless, the Amended Complaint avers that Ms. Kelly first took JW to a "Med Express" that same night for an examination and that they were referred to Children's Hospital of Pittsburgh.

While at Children's Hospital, JW apparently changed her explanation and recounted that the injury was caused by her step-sister, BS. This new version of events apparently involved allegations of sexual abuse by BS. Children's Hospital referred the incident to Washington County Children and Youth Services ("CYS") and the case was assigned to Defendant Angela Marling.

Shortly thereafter, Marling initiated an investigation which the Amended Complaint describes as "biased and incomplete." According to Plaintiffs, Marling knew or should have known "that the account by JW of inappropriate contact was unsubstantiated, unreliable, and contradicted by her own prior accounts of events." ECF No. 9 at 4. To that end, Plaintiffs aver that JW had a documented history of fabricating stories; that JW had told at least three different and incompatible versions regarding the June 26, 2012 incident; and that no medical evidence supported the claims by JW *except* that she was injured in a fall onto an exercise bike.

The "faulty" investigation ultimately led to the implementation of a "Safety Plan" at the Weavers' home the day after the incident. The Safety Plan, allegedly instituted by Marling even

2

before she interviewed Plaintiffs, prohibited the Weavers from having any contact with JW—a restriction that lasted until mid-September 2012.

During that three-month span, Marling's (so-called) violative conduct apparently continued. As Plaintiffs allege: Marling threatened to take the Weavers' other children unless they agreed and abided by a Safety Plan; intentionally failed to provide Plaintiffs with notice of their right to appeal the Safety Plan in violation of the governing statutes and regulations; misinformed/intimidated Plaintiffs in order to prevent them for exercising their right to have a hearing regarding the removal of JW from their home; repeatedly referred to BW as a "perpetrator" prior to the closure of the investigation; and notified JW's elementary school that Mr. Weaver was to have no unsupervised contact with his daughter and that the school should not release JW to her father. Roughly three months after the restriction was lifted for some unknown reason, this lawsuit followed.

Plaintiffs commenced this action on December 6, 2012 by the filing of a three-count Complaint in which they allege due process violations and a pendant state law claim for Intentional Infliction of Emotional Distress ("IIED"). Defendant Marling responded by filing a Rule 12(b)(6) motion in which she raises the defense of qualified immunity and argues that the IIED count fails due to various statutory protections afforded to local agencies and their employees. Alternatively, Marling submits the IIED claim does not meet the federal pleading standard.

Plaintiffs replied by filing a nearly-identical Amended Complaint (ECF No. 9) in which they assert the same three causes of action.[2] Marling renewed her Rule 12(b)(6) motion in which she sets forth similar defenses. Plaintiffs oppose this motion in its entirety. The Court now turns

---

2. The Court notes that the Amended Complaint only adds a handful of paragraphs, but that it only considers the more-recent pleading at this time. *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013).

to the substance of the pending motion to dismiss.

## II. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint, which may be dismissed for the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) When reviewing a motion to dismiss, the Court must accept all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1861 (2012) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)). However, as the Supreme Court of the United States made clear in *Bell Atlantic Corp. v. Twombly*, such "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. 554, 555 (2007).

The Supreme Court later refined this approach in *Ashcroft v. Iqbal*, emphasizing the requirement that a complaint must state a plausible claim for relief in order to survive a motion to dismiss. 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 555). Nevertheless, "the plausibility standard is not akin to a 'probability requirement,'" but requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 555).

To determine the legal sufficiency of a complaint after *Twombly* and *Iqbal*, the United States Court of Appeals for the Third Circuit instructs that a district court must take a three step approach when presented with a motion to dismiss for failure to state a claim. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010) (noting that although *Iqbal* describes the

4

process as a "two-pronged approach," it views the case as outlining three steps) (citing *Iqbal*, 556 U.S. at 675). First, "the court must "tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* at 130 (quoting *Iqbal*, 556 U.S. at 675) (alteration in original). Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Accordingly, the Court must separate the factual and legal elements of the claim and "accept the factual allegations contained in the Complaint as true, but [ ] disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-57; *Burtch*, 662 F.3d at 220-21). The Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Iqbal* 556 U.S. at 678). The determination for "plausibility" will be "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

Nevertheless, nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion to dismiss pursuant to Rule 12(b)(6) and the requirements of Rule 8 must still be met. *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal citations omitted). The Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts must be taken

5

as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on those merits." *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 553). Rule 8 also still requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 677-78 (citing Fed. R. Civ. P. 8(a)(2)). While this standard "does not require 'detailed factual allegations,' [ ] it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 544-55). Simply put, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

The same approach is followed when qualified immunity is asserted in a Rule 12(b)(6) motion. At this stage of the proceedings, qualified immunity must be established on the face of the complaint to warrant dismissal before the commencement of discovery. *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. Pa. 2001). *C.f. Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) ("We caution, however, that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases."). To be sure, "a plaintiff has no pleading burden to anticipate or overcome a qualified immunity defense, and a mere absence of detailed factual allegations supporting a plaintiff's claim for relief under § 1983 does not warrant dismissal of the complaint or establish defendants' immunity." *Thomas v. Independence Twp.*, 463 F.3d 285, 289 (3d Cir. 2006).[3]

---

3. The Court notes that the general holdings of *Thomas* have not been affected by the Supreme Court's *Iqbal* ruling. *See Perano v. Arbaugh*, 10-CV-01623, 2011 WL 1103885, at *17 n.71 (E.D. Pa. Mar. 25, 2011) ("While *Iqbal* had not been decided at the time of the *Thomas* case, which focused on notice pleading, it is unlikely that the holding in *Thomas* has been abrogated. The tension still exists because it is possible for a claim to survive a motion to dismiss under *Iqbal* while not providing sufficient facts to allow the court to conduct a qualified immunity analysis.") (citation omitted); *see also Zion v. Nassan*, 727 F. Supp. 2d 388, 404 (W.D. Pa. 2010) (same).

### III. Discussion

The Amended Complaint presents two federal civil rights claims and a pendent IIED claim. Marling seeks dismissal of each claim, and Plaintiff requests leave to amend should the Court grant the motion. The Court will address the constitutional and state law claims seriatim.

**A. Due Process Claims**

Marling contends that both due process claims should be dismissed based on qualified immunity. Of course, in determining whether an official is entitled to qualified immunity, a court must address the following two questions: (1) whether the facts alleged by the plaintiff establish a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Marling initially challenges the second prong of the analysis, but she muddles the issue. As Marling states:

> While the Weavers do not plead the violation of a constitutional right (prong one), they fail to plead that the right to a court order or a hearing was clearly established (prong two). Whether the Weavers had an affirmative duty to plead the basis of their right to a court order or hearing is not so much the point; rather, the omission itself is telling and militates against the existence and clear establishment of the right in the first instance.

ECF No. 11 at 7. This pleading theory misses the point. *See Thomas*, 463 F.3d at 293 ("[G]eneral rules of pleading prescribed by the Federal Rules, [ ] require the plaintiff to set forth only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and place on the defendant the burden to set forth any 'matter constituting an avoidance or affirmative defense.'") (quoting Fed. R. Civ. P. 8(a), (c)); *see also id.* ("[W]e conclude that a plaintiff has no obligation to plead a violation of clearly established law in order to avoid dismissal on qualified immunity grounds.").

7

The relevant inquiry is instead whether a reasonable caseworker in Marling's position at the time could have believed that her conduct would be lawful, in light of relevant law and information that the professional possessed. After her initial foray into pleading matters, Marling attempts to apply this standard to both counts concomitantly, or at least, makes no real attempt to distinguish the two due process claims much like her counterparts. The Court takes a different approach and addresses each count in turn.

1. <u>Substantive Due Process</u>

At Count One of the Amended Complaint, Plaintiffs allege a Fourteenth Amendment substantive due process claim based on the "the interference with [their] familial integrity" by Marling. As the Court reads the Amended Complaint, the alleged substantive due process violation is fundamentally rooted in (1) the removal of JW from the Weavers' home and the custody restriction for three months without reasonable grounds; and (2) the threat to remove their other children when no reasonable basis existed, unless they agreed to comply with the Safety Plan. Plaintiffs also submit that other (in)action by Marling—perhaps misplaced under the *substantive* due process heading—violated their rights.

Marling submits that her adherence to state statutes and regulations demonstrates that she performed her duties "reasonably" thus relieving her from liability. From Marling's perspective, "CYS received a report from the Children's Hospital that a physical examination of JW indicated signs of suspected physical or sexual abuse [and] [u]pon being assigned the case, [she] intervened and initiated an investigation that was entirely appropriate and reasonable given the report by a medical professional." ECF No. 11 at 7-8. In this apparent attempt to refute the substantive due process claim, Marling further argues that "had [she] not undertaken the investigation, she would have fallen short of the duty imposed on her by law." ECF No. 8 at 11.

Marling similarly concludes (while injecting facts beyond the Amended Complaint) that her "reasonable investigation" led to the implementation of the Safety Plan, which placed JW in the sole custody of Ms. Kelly rather than in protective custody.

The constitutionally protected liberty interests that parents have in the custody, care, and management of their children is well-established. *Croft v. Westmoreland Cnty. CYS*, 103 F.3d 1123, 1125 (3d Cir. 1997). "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children—particularly where the children need to be protected from their own parents." *Id.* (citation omitted). That interest, however, "does not include a right to remain free from child abuse investigations." *Id.* In other words, "the rights of the parent must be balanced against the state's interest in protecting children suspected of being abused." *Id.* (citation omitted).

As this Court explained fairly recently, "[t]he balancing of these interests does not create a "Catch 22" in which a caseworker will face liability regardless of whether she acts or refrains from acting . . . . The law requires a third alternative—a reasonable, individualized investigation." *Bower v. Lawrence Cnty. Children & Youth Servs.*, 2:11-CV-931, 2011 WL 5523712, at *6 (W.D. Pa. Nov. 14, 2011). Accordingly, "[t]o override the parental interest the state must have some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse; [r]emoval of a child from parental custody without reasonable suspicion to believe ongoing parental custody presents a threat to the child's health or safety constitutes an arbitrary abuse of government power." *Id.* (citations omitted). *See also Croft*, 103 F.3d at 1126 (citing *Myers v. Morris*, 810 F.2d 1437, 1462-63 (8th Cir. 1987) ("noting [that the] parental liberty interest in maintaining integrity of

9

family unit is not a clearly established right where there is a 'reasonable suspicion' abuse may have occurred")).

Bearing these standards in mind, the Court cannot conclude at this time that Marling is entitled to qualified immunity with regard to the substantive due process claim. Marling may in fact be accurate that "[t]he Weavers did not possess and could not assert a right to remain free from the investigation [itself]," but that is not the complete picture. Rather, the decision to remove JW and the length of the resulting separation implicate the fundamental parental rights. The general focus of Marling's argument is that she acted "reasonably" by initiating an investigation into suspected child abuse per the mandate of the state statute. From that premise, Marling somehow concludes that the removal of JW and the approximately three-month long separation was likewise "reasonable" based upon some articulable evidence. Notably absent are any facts pled to support that contention. Indeed, that logical leap would necessarily require the Court to conclude that her adherence to a state statute's directive alone implies that Marling satisfied the relevant constitutional inquiry throughout—an exercise in which the Court declines to engage.

The Court will ultimately have to balance the Weavers' right to familial integrity with the government's interest in protecting JW after the benefit of discovery during which the parties will surely uncover what information was available to Marling. Only then may the Court meaningfully decide whether an objectively reasonable suspicion of abuse existed to justify the initial removal of JW and the resulting three-month separation. Accordingly, the Court will deny the motion to dismiss Count One of the Amended Complaint.

2. Procedural Due Process

At Count Two of the Amended Complaint, Plaintiffs set forth a Fourteenth Amendment procedural due process claim in which they simply repeat the paragraphs pleaded under Count One with minimal modifications. As the Amended Complaint is once again parsed through, the averments regarding the removal of JW without judicial approval and the failure to provide a post-deprivation hearing arguably form the basis for the alleged procedural due process claim.

Marling challenges Count Two on two related but somewhat distinct grounds: (1) that her strict compliance with the applicable state statutes and regulations relieves her from liability; and (2) that the right to judicial authorization or a hearing is not clearly established. In support, Marling highlights that the Weavers do not identify which statutes and/or regulations she allegedly violated and concludes that "[t]hey cannot simply claim to have been deprived of a right that is not moored to a particular statute or regulation or other basis in the law." ECF No. 11 at 9. Similarly, Marling notes that "[t]he regulations do indeed mandate that CYS or [she] would have had to obtain court order authorizing placement" but that "JW was not the subject of placement because she "remain[ed] in the care and custody of Ms. Kelly during the initial investigation in order to separate and protect her from BS." ECF No. 11 at 9-10. Thus, as Marling reasons, "JW was not removed from the Weavers' home and formally placed, and therefore, per the regulations, no court order was necessary." ECF No. 11 at 10. This challenge to Count Two cannot withstand scrutiny.

As a threshold matter, the resort to state law is unavailing in the context of a Fourteenth Amendment procedural due process challenge. *See B.S. v. Somerset Cnty.*, 704 F.3d 250, 273 (3d Cir. 2013) (noting that "the question of 'what process is due' is a matter of constitutional law, not state law") (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)); *see*

*also id.* ("[D]ue process required the County to offer Mother a chance to be promptly heard after they took Daughter from her home, regardless of whether or not state law independently imposed that obligation."). Thus, the Court is not persuaded at this time by Marling's quarrels with whether she "removed" JW from the Weavers' home and pursued "placement" of JW, which would have triggered certain procedural protections. *See B.S. v. Somerset Cnty.*, 704 F.3d 250, 272 (3d Cir. 2013) ("From the parent's perspective, there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here. In either case, the government has implicated a fundamental liberty interest of the parent who loses custody.").

The Court similarly cannot conclude at this time that Marling has met her burden in showing that she is entitled to qualified immunity. Marling once again attempts to impermissibly shift the burden onto Plaintiff (*e.g.*, "[t]he Weavers have failed to delineate any clearly established right to judicial authorization or a hearing) in order to overcome the second prong of the analysis. *See Thomas*, 463 F.3d at 293 ("[A] plaintiff need not plead allegations relevant to an immunity claim in order to set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)). To the extent that Marling raises this issue on her own, the result does not change. Courts to address this issue at the motion to dismiss stage have held that a counselor was not entitled to qualified immunity. *See, e.g.*, *Brown v. Daniels*, 128 F. App'x 910, 916 (3d Cir. 2005) ("Accepting the allegations in the complaint as true and drawing all inferences in the Browns' favor, a reasonable [Child and Youth Services] employee could not have believed that a post-deprivation hearing conducted seven weeks after the removal of a child from his parents' home complied with due process.") (citing *Miller v. City of Philadelphia*, 174 F.3d 368, 372 n.4 (3d Cir. 1999); *Patterson v.*

12

*Armstrong Cty. Children & Youth Services*, 141 F. Supp. 2d 512, 540-42 (W.D. Pa. 2001)). This Court takes a similar approach and concludes that Marling is not entitled to qualified immunity with regard to the procedural due process claim at this time. Accordingly, the Court will deny the motion to dismiss Count Two.

**B.    IIED**

At Count Three of the Amended Complaint, Plaintiffs pursue a pendant IIED claim. Plaintiffs allege that, as a result of Marling's conduct, they suffered "severe emotional distress; various physical maladies including but not limited to, headaches, loss of appetite, upset stomach and nausea; loss of the support, society, and companionship of friends and family; fright, horror, and shock; emotional trauma and suffering; and economic damages related to any and all medical and/or other consequential costs." ECF No. 9 at 9-10.

Marling submits three separate grounds on which the Court should dismiss this count. First, Marling invokes the Child Protective Services Law ("CPSL"), 23 PA. CONS. STAT. ANN. § 6317, which affords agency employees statutory immunity for certain activities and includes a good faith presumption. Second, Marling cites to the protections embodied in Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), 42 PA. CONS. STAT. ANN. § 8541, *et seq.*, which shields local agencies from liability and their employees from liability unless they fall within an exception. Third, Marling contends that they failed to adequately plead the physical injury element of an IIED claim or bring evidence of "competent medical evidence" to bear. Although these arguments are certainly not without logical force, they are premature at this juncture.

1. CPSL

Section 6318 of the CPSL grants social workers good-faith immunity from civil liability under state law. 23 PA. CONS. STAT. ANN. § 6318. *See also Hedges v. Musco*, 204 F.3d 109, 115-16 (3d Cir. 2000) ("[S]tate law cannot immunize government employees from liability resulting from their violation of federal law.") (citing *Good v. Dauphin Co. Social Serv. for Children and Youth*, 891 F.2d 1087, 1091 (3d Cir. 1989)). "The good faith of the social worker's actions is statutorily presumed, 23 PA. CONS. STAT. ANN. § 6318(b), and good faith must be judged on an objective standard." *Miller v. City of Philadelphia*, CIV. A. 96-3578, 1997 WL 476352, at *5 (E.D. Pa. Aug. 19, 1997) (citing *Brozovich v. Circle C Group Homes, Inc.*, 548 A.2d 698, 700 n.3 (Pa. Commw. Ct. 1988)). To overcome immunity at this stage, plaintiffs must allege facts that display the defendant's bad faith. *C.f. Miller v. City of Philadelphia*, 954 F. Supp. 1056, 1066 (E.D. Pa. 1997) *aff'd*, 174 F.3d 368 (3d Cir. 1999.)

Construing the Amended Complaint liberally and drawing all inferences in favor of the non-moving party as the law requires, the Court finds that Plaintiffs aver sufficient factual material to overcome this defense at this time. For example, Plaintiffs allege that Marling formulated a plan to restrict custody of JW to her adoptive mother before she even interviewed the Weavers, threatened to remove their other children form their home if they challenged her "Safety Plan," barred the Weavers from having unsupervised contact with JW for approximately three months without any justification, and disregarded relevant evidence regarding possible fabrications and/or inconsistencies. Accepting those allegations as true, the presumption is overcome for purposes of the motion to dismiss. Should discovery reveal otherwise, the Court will certainly revisit this issue. Accordingly, the Court will deny the motion to dismiss Count Three on this basis.

### 2. PSTCA

The PSTCA also extends immunity to local agencies and their employees for negligent acts, 42 PA. CONS. STAT. ANN. § 8542(b), but it abrogates the statutory protection for individuals who engage in conduct that "constituted a crime, actual fraud, actual malice or willful misconduct," 42 PA. CONS. STAT. ANN. § 8550. The term "'willful misconduct' in this context has the same meaning as the term 'intentional tort.'" *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 287 (3d Cir. 2006) (citations omitted). *See generally Kokinda v. Breiner*, 557 F. Supp. 2d 581, 595 (M.D. Pa. 2008) ("In light of this standard, conduct amounting to the tort of intentional infliction of emotional distress would constitute willful misconduct; Defendants' argument for immunity from this claim under the PSTCA is thus without merit.").

The Court will take a similar approach with the PSTCA as done with the CPSL. Much like above, the conduct as pleaded could arguably meet the requisite level. Accepting Defendant's invitation to make a finding that her conduct did not rise to the level of willful misconduct would require the Court to impermissibly assume facts not properly in the record and comment on the merits of the action at this early stage. Accordingly, the motion to dismiss on this basis will be denied.

### 3. Competent Medical Evidence

While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for IIED, "courts generally assume for purposes of analysis that the [intentional] tort exists, and proceed to hold that to survive a motion to dismiss, the allegations must 'at a minimum' correspond with the provisions of the RESTATEMENT (SECOND) OF TORTS § 46(1)." *Kokinda v.*, 557 F. Supp. 2d at 596 (citing *Reardon v. Allegheny College*, 926 A.2d 477, 487 & n.12 (Pa. Super. Ct. 2007)). "Those provisions are that (1) the conduct is extreme and outrageous; (2) it is

intentional or reckless; (3) it causes emotional distress; (4) that distress is severe." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 46). Moreover, "[i]n order to state a claim under which relief can be granted for [IIED], the plaintiffs must allege physical injury." *Dittrich v. Seeds*, CIV.A.03-CV-6128, 2005 WL 2436648 (E.D. Pa. Sept. 28, 2005) (citing *Rolla v. Westmoreland Health System*, 651 A.2d 160, 163 (Pa. Super. Ct. 1994). To ultimately *prevail* on an IIED claim, however, "a plaintiff must provide competent medical evidence to prove the existence of emotional distress." *Id.* (citations omitted). *See Hall v. Raech*, CIV.A. 08-5020, 2009 WL 811503, at *7 (E.D. Pa. Mar. 25, 2009) (concluding that a plaintiff pleaded facts sufficient to state a claim for intentional infliction of emotional distress at the motion to dismiss stage but would eventually need to support this claim with competent medical evidence of the alleged emotional distress).

The Amended Complaint pleads the requisite elements for an IIED claim, and Plaintiffs were not required to provide additional evidence at the pleading stage. Plaintiffs will, however, have to ultimately adduce competent medical evidence to survive a later dispositive motion. Accordingly, the motion to dismiss Count Three on this basis will be denied.

### IV. Conclusion

For the reasons hereinabove stated, the Court will deny the motion to dismiss. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN WEAVER and JAMIE WEAVER, individually and as parents and natural guardians of JW and BS, *minors*, <br><br> Plaintiffs, <br><br> vs. <br><br> ANGELA MARLING, *as an individual*, <br><br> Defendant. | 2:12-cv-1777 |

## ORDER OF COURT

AND NOW, this 8th day of August, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) (ECF No. 10) filed by Defendant Angela Marling is **DENIED**. Plaintiff shall file an Answer to the Amended Complaint on or before August 22, 2013.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Joel S. Sansone**
Email: joelsansone03@msn.com
**Adam K. Hobaugh**
Email: adam.hobaugh@murtagh-cahill.net

**Robert J. Grimm**
Email: rgrimm@swartzcampbell.com